CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Donald A. Ecklund
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRIAN FELDMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SCYNEXIS, INC, DAVID ANGULO, AND IVOR MACLEOD,<br><br>Defendants. | Case No. 23-cv-22082-BRM-CLW<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS .......................................................................................... 3

    A.  Scynexis, Which Holds Itself Out As An Experienced Manufacturing Company, Gets Approval For Its Lone Drug Candidate And Begins Having It Manufactured To Treat Vaginal Yeast Infections ........................................................................ 3

    B.  Since The Sale Of Its Only Drug For Treating Vaginal Yeast Infections Is Not Profitable, Scynexis Pivots In A New Direction With A Different Management Team ........................................................................................................................ 4

    C.  Scynexis Finds A Major Pharmaceutical Company Willing To Partner To Commercialize Its Lone Drug Candidate ............................................................... 4

    D.  GSK Quickly Uncovers That Scynexis Was Not Complying With Current Good Manufacturing Practices, Resulting In A Complete Recall ................................... 5

    E.  The FDA Confirms The Recall Was Necessary And Placed A Clinical Hold On Its Sole Drug, And GSK Renegotiated Its Deal With Scynexis To Reduce Milestone Payments ................................................................................................................. 6

    F.  At All Times, Scynexis Was Required To Ensure Its Manufacturer's Compliance With cGMP And That It Was Preventing Cross-Contamination Of Drug Products .................................................................................................................. 7

        1.  The cGMP Regulations Require Building And Facility Controls To Prevent Cross-Contamination, Particularly For Substances That Can Cause Life-Threatening Allergic Reactions ................................................................. 8

        2.  Processing Of Beta-Lactam Drugs Without Complete And Comprehensive Separation From Non Beta-Lactam Products Is Prohibited ........................ 8

        3.  Processing Of Any Beta-Lactam Products In A Manner Which Does Not Prevent Cross Contamination Is Prohibited ............................................... 9

    G.  Scynexis Falsely Claimed That It Was Ensuring Compliance With Required FDA Regulations Including Preventing Cross-Contamination And Insanitary Conditions Through Continual Review And Periodic Inspections .......................................... 9

III.  APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ......... 10

IV.  ARGUMENT ........................................................................................................... 11

A.     Defendants' Misrepresentations Are Actionable ................................................... 11

     1.     Legal Standard ...................................................................... 11

     2.     Defendants' Statements Were False And Misleading ............................ 12

     3.     Defendants' Misstatements Were Material............................................. 15

     4.     Defendants' Statements Are Not Opinions Or Puffery............................ 17

     5.     Defendants Had A Duty To Disclose That The Company's Manufacturers Were Not In Compliance With Appropriate Requirements And The Company Was Failing To Monitor And Ensure Such Compliance.......... 18

B.     The Complaint Raises A Strong Inference Of Scienter ....................................... 20

C.     Plaintiff Adequately Alleges Control Person Liability ........................................ 25

V.     CONCLUSION................................................................................................... 26

# **TABLE OF AUTHORITIES**

<u>CASES</u>

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
   532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................. 13, 21

*Arnlund v. Deloitte & Touche LLP*,
   199 F. Supp. 2d 461 (E.D. Va. 2002) ..................................................................... 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 10

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................................................................ 15

*Bauer v. Eagle Pharm., Inc.*,
   2017 WL 2213147 (D.N.J. May 19, 2017) .............................................................. 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 11

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) .................................................................................... 11

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ..................................................................................... 13

*Connor v. Unisys Corp.*,
   2024 WL 387633 (E.D. Pa. Feb. 1, 2024) ............................................................... 15

*Fergus v. Immunomedics, Inc.*,
   2020 WL 2832565 (D.N.J. June 1, 2020) ................................................................ 11

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................................................... 24

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019) .............................................................. 19

*Hoey v. Insmed Inc.*,
   2018 WL 902266 (D.N.J. Feb. 15, 2018) ................................................................ 14

*In re Able Lab'ys Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008) .............................................................. 16

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ............................................................................ 15, 18

*In re Allergan Generic Drug Pricing Sec. Litig.*,
2019 WL 3562134 (D.N.J. Aug. 6, 2019) ................................................................ 22

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................................ 16

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................................ 23

*In re Amarin Corp. PLC Sec. Litig.*,
2022 WL 2128560 (3d Cir. June 14, 2022) ............................................................... 17

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ...................................................................... 23

*In re Cabletron Sys.*,
311 F.3d 11 (1st Cir. 2002) ........................................................................................ 24

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................... 20, 21

*In re Celgene Corp. Sec. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019) ................................................................ 20

*In re Discovery Lab'ys Sec. Litig.*,
2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) .............................................................. 14

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015) .......................................................... 18, 23

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ........................................................... 16

*In re Majesco Sec. Litig.*,
2006 WL 2846281 (D.N.J. Sept. 29, 2006) ...................................................... 2, 14, 23

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012) ................................................................... 18

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................................................................. 11

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)..........................................................................19

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...............................................................................24

*In re Regeneron Pharm., Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)...........................................................................22

*In re Rent-Way Sec. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002)..................................................................................22

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................................................16

*In re Sepracor, Inc., Sec. Litig.*,
308 F. Supp. 2d 20 (D. Mass. 2004) ....................................................................................24

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ......................................................................15

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ......................................................................21, 25, 26

*In re Vicuron Pharms., Inc. Sec. Litig.*,
2005 WL 2989674 (E.D. Pa. Jul. 1, 2005)...........................................................................22

*In re Viropharma, Inc. Sec. Litig.*,
2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .........................................................................25

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
2009 WL 464934 (S.D.N.Y. Feb. 25, 2009).........................................................................18

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022) .................................................................12, 13, 17, 21

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).........................................................................................20, 21, 22

*Johnson v. Costco Wholesale Corp.*,
2020 WL 4816225 n.15 (W.D. Wash. Aug. 19, 2020).........................................................15

*Junker v. Med. Components, Inc.*,
2015 WL 12806501 (E.D. Pa. May 20, 2015) .....................................................................26

iv

*Langford v. City of Atl. City*,
  235 F.3d 845 (3d Cir. 2000).................................................................................. 11

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
  173 F. Supp. 2d 129 (S.D.N.Y. 2001).............................................................. 14, 23

*Loc. 731 I.B. of T. Excavators & Pavers Pens. Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011)............................................................ 16

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC,
  797 F.3d 160 (2d Cir. 2015).................................................................................. 26

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024).............................................................................................. 20

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).......................................................................................... 10, 11

*McDermid v. Inovio Pharm., Inc.*,
  520 F. Supp. 3d 652 (E.D. Pa. 2021) .................................................................... 19

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
  2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012)........................................................ 23

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)............................................................................. 12, 16

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................... 22

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ...................................................................... 24

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).................................................................................. 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................................................. 17

*Paxton v. Provention Bio, Inc.*,
  2022 WL 3098236, (D.N.J. Aug. 4, 2022) ....................................................... 14, 17

*Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  2015 WL 3833849 (M.D. Pa. June 22, 2015)........................................................ 18

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)............................................................................. 2, 11

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)........................................................ 22, 24

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ............................................................... 17, 20

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992).................................................................................. 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .................................................................... 10, 20, 21, 24

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................................ 14

*U.S. v. Schiff*,
    602 F.3d 152 (3d Cir. 2010)................................................................................... 18

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015) ......................................................... 25

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ................................................................................. 14

## STATUTES

15 U.S.C. § 78t(a) ...................................................................................................... 25

15 U.S.C. § 78u-4(b) .................................................................................................. 10

21 U.S.C. § 351............................................................................................................ 7, 8, 9

21 U.S.C. § 301........................................................................................................... 7

## RULES

Fed. R. Civ. P. 9(b) .................................................................................................... 10

Fed. R. Civ. P. 12(g) .................................................................................................. 10

Fed. R. Civ. P. 15(a)(2).............................................................................................. 26

Lead Plaintiff Brian Feldman ("Plaintiff") respectfully submits this opposition to Defendants' motion to dismiss (ECF 28, the "Motion") the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 14, the "Complaint").[1]

I.     **INTRODUCTION**

Scynexis, a pharmaceutical company that had a ***single drug*** manufactured at a single facility, recklessly failed to disclose that the equipment used to manufacture this drug was not sufficiently separated from the manufacture of other potentially deadly drugs, thereby presenting a risk of cross-contamination.  The Company also failed to disclose that it did not ensure compliance with current Good Manufacturing Practices ("cGMP"), which would have ensured there was no such cross-contamination risk in the first place.

The truth of these material omissions only surfaced when Scynexis's new licensing partner, the pharmaceutical giant GSK plc ("GSK"), uncovered the issues within months of agreeing to work with the Company by simply conducting a physical inspection of the manufacturing facility. The market and analysts were shocked by the fact that the Company had apparently not ensured the facility complied with cGMP and proper drug manufacturing practices.  Indeed, the Company's stock cratered by more than 34%, and an analyst recognized that:

> ***We still lack clarity as to why the manufacturing equipment was shared with beta-lactams and how it was not discovered earlier.*** Recall, Brexafemme earned FDA approval for vulvovaginal yeast infections in June 2021, and we believe its commercial manufacturing is the same as its clinical manufacturer. ***We would expect that ahead of GSK's March licensing agreement it would have physically inspected the IBX manufacturing facilities***.

---

[1] Defendants are Scynexis, Inc. ("Scynexis" or the "Company"), David Angulo, and Ivor Macleod (collectively, "Defendants").  The brief filed by Defendants (ECF 28-1) is cited as "Def. Br." and Defendants' exhibits attached to the Declaration of Caroline Pignatelli (ECF 28-2) are cited as "Def. Ex." All "¶__" citations are to the Complaint.  All emphasis is added, and all internal citations and quotation marks are omitted, unless otherwise stated.

Defendants incorrectly argue that the Complaint is based on "assumptions" and relies on "fraud-by-hindsight." The Complaint, however, is based, among other things, on the Company's own admissions, which is clearly a valid source of information regardless of how Defendants frame it, and well-pled inferences that are appropriate on a motion to dismiss where Plaintiff's allegations must be accepted as true. Faced with this reality, Defendants resort to claiming that Plaintiff must provide evidence to be "well-pled" at the motion to dismiss stage. Def. Br. at 2 (claiming the Complaint is not "well-pled" because there is "no document, no conversation, no confidential witness, no report"). But a well-pled claim "does not impose a probability requirement at the pleading stage," but "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008); *In re Majesco Sec. Litig*., 2006 WL 2846281, at *6 (D.N.J. Sept. 29, 2006) (particularity "does not demand an exhaustive cataloging of facts"). And Plaintiff has clearly met this bar.

Defendants' other arguments fare no better. For example, Defendants hang their hat on their claim that they recalled their drug "out of an abundance of caution" "based on non-binding, FDA draft guidance that was subject to change." Def. Br. at 1, 12, 17. But this is just the Company trying to put a positive spin on a terrible situation. Several facts confirm that the cross-contamination risk was pervasive and material so as to require a recall: (i) Scynexis was forced to recall all batches of the drug ever produced; (ii) GSK, the pharmaceutical giant that had an exclusive license for the development, manufacture, and commercialization of ibrexafungerp and whose Scynexis's entire financial future depended on, "recommended" to the Company they recall the drug; and (iii) "the FDA concurred with the Company's voluntary hold and placed a clinical hold on ibrexafungerp." ¶¶41, 44. When your development partner "recommends" that you recall

2

all your produced drugs because of cross-contamination risks, which the FDA soon confirms was a necessary decision, the choice to recall the drugs was not as optional or benevolent as Defendants' attempt to portray it as. In any case, whether the recall was required is not outcome-determinative. The relevant issue is whether there was an undisclosed material risk, and the Complaint sufficiently alleges there was.

When the Complaint is viewed as true, as it must, it states a claim for relief plausible on its face. Thus, the Motion to Dismiss should be denied in its entirety.

## II.    <u>STATEMENT OF FACTS</u>

Scynexis is a biotechnology company that develops and sells ibrexafungerp, a broad-spectrum agent for fungal indications that is administered intravenously or orally. ¶2.

### A.    Scynexis, Which Holds Itself Out As An Experienced Manufacturing Company, Gets Approval For Its Lone Drug Candidate And Begins Having It Manufactured To Treat Vaginal Yeast Infections

In June 2021, the Company received approval from the United States Food and Drug Administration ("FDA") for the use of ibrexafungerp tablets, distributed under the brand name BREXAFEMME®, for the treatment of vulvovaginal candidiasis (also known as vaginal yeast infection). ¶¶3, 34.

According to Scynexis, it believed its team was capable of overseeing the manufacturing process and ensuring its third-party vendors were complying with compliance requirements:

> A drug manufacturing program subject to extensive governmental regulations requires robust quality assurance systems and experienced personnel with the relevant technical and regulatory expertise as well as strong project management skills. We believe we have a team that is capable of managing these activities.

¶35. Indeed, the Company's then-CEO Marco Taglietti ("Taglietti") touted on an earnings call that, at its core, Scynexis was an experienced manufacturing business:

> I would like to remind you that SCYNEXIS at its DNA actually is a manufacturing company. This is what the company has been for probably 2 decades. So we know

how to develop, produce, manufacture a product, and the supply chain has been actually quite successfully making sure that the product was available in all pharmacies.

¶59.    Soon after approval, the Company manufactured, packaged, and distributed BREXAFEMME® to pharmacies through contract manufacturers and external vendors.  ¶¶3, 35.

**B.    Since The Sale Of Its Only Drug For Treating Vaginal Yeast Infections Is Not Profitable, Scynexis Pivots In A New Direction With A Different Management Team**

BREXAFEMME, the Company's sole drug candidate, was not profitable.  ¶36.  Since its inception, the Company has incurred net losses each year.  *Id.*  Because it was hemorrhaging money, in October 2022, the Company announced a new strategic direction to refocus its resources on the clinical development of ibrexafungerp for severe, hospital-based indications, where the Company claimed there were higher long-term returns.  ¶37.  To do so, Scynexis intended to out-license BREXAFEMME for vaginal yeast infections and was actively pursuing a U.S. commercialization partner.  *Id.*  Moreover, the Company announced that it would wind down its promotional activities for BREXAFEMME, while keeping BREXAFEMME on the market and available to patients.  *Id.*

Moreover, along with these changes to its business strategy, the Company replaced its leadership. CEO Taglietti, Chief Commercial Officer Christine Coyne, and Interim Chief Financing Officer Larry Hoffman all left the Company.  ¶38.  Then-Chief Medical Officer Angulo was appointed as CEO, and Defendant Macleod became the new CFO.  ¶38.

**C.    Scynexis Finds A Major Pharmaceutical Company Willing To Partner To Commercialize Its Lone Drug Candidate**

Scynexis quickly found its commercialization partner in GSK and entered into a licensing agreement on March 30, 2023.  ¶39.  The agreement was an exclusive, royalty-bearing license for the development, manufacture, and commercialization of ibrexafungerp, including the approved

4

product BREXAFEMME, for all indications in most countries. *Id.* The Company would receive an upfront payment of $90 million and potential payments if certain milestones were met, including regulatory approval milestone payments of up to $70 million, commercial milestone payments of up to $115 million, and sales milestone payments of up to $242.5 million based on annual net sales. *Id.* In total, the Company was eligible to receive potential milestone-based payments totaling $503 million in addition to royalties based on a percentage of cumulative annual sales (which would be in the mid-single digit to mid-teen range). *Id.*[2]

> **D.    GSK Quickly Uncovers That Scynexis Was Not Complying With Current Good Manufacturing Practices, Resulting In A Complete Recall**

At the start of the Class Period (March 31, 2023), a day after the license with GSK was signed, the Company stated that its vendors who "support manufacturing and supply both for clinical development and commercial needs have the required capabilities with respect to facilities, equipment and technical expertise, quality systems that meet global regulatory and compliance requirements." ¶47. Likewise, the Company acknowledged that it "must continue to expend time, money and effort in all areas of regulatory compliance, including manufacturing, production and quality control." ¶48. Having the required capabilities to oversee manufacturing compliance requirements was vital to the Company because the "[f]ailure to follow cGMP can result in products being deemed adulterated, which carries significant legal implications." ¶¶48, 50.

Yet, on September 25, 2023, the Company announced a recall of BREXAFEMME tablets due to risk of cross contamination. ¶41. The Company revealed that "a non-antibacterial beta-lactam drug substance is manufactured using equipment common to the manufacturing process for ibrexafungerp" following GSK's "review of the manufacturing process and equipment at the

---

[2] On June 21, 2023, the Company announced the achievement of a $25 million performance-based development milestone under the GSK license agreement. ¶40.

vendor that manufactures the ibrexafungerp drug substance." *Id*. As the Company explained, the FDA suggests segregation of becta-lactam compounds (like BREXAFEMME) "from other compounds since beta-lactam compounds have the potential to act as sensitizing agents that may trigger hypersensitivity or an allergic reaction in some people." *Id*. Failure to comply with this recommendation presented "a risk of cross contamination." *Id.* As a result, Scynexis followed GSK's recommendation and recalled the product and "plac[ed] a temporary hold on clinical studies of ibrexafungerp, including the Phase 3 MARIO study, until a mitigation strategy and a resupply plan are determined." *Id.*

Following the recall announcement, the Company's stock cratered. On September 25, 2023, the Company's shares fell $1.13, or 34.14%, to close at $2.18 per share, on unusually heavy trading volume. ¶42. The stock price continued to fall the next trading session by 11.47% to close at $1.93 per share on September 26, 2023, also on unusually heavy trading volume. *Id.*

Analysts were flummoxed by how Scynexis had not uncovered the issue earlier as it has been manufacturing and selling BREXAFEMME since 2021, yet GSK was able to uncover within six months. ¶¶62-63. As the research analyst firm, Ladenburg Thalmann, explained in a January 3, 2024 report, "We would expect that ahead of GSK's March licensing agreement it would have physically inspected the IBX manufacturing facilities." ¶63. As the report continued, "We still lack clarity as to why the manufacturing equipment was shared with beta-lactams and how it was not discovered earlier." *Id.*

> **E.    The FDA Confirms The Recall Was Necessary And Placed A Clinical Hold On Its Sole Drug, And GSK Renegotiated Its Deal With Scynexis To Reduce Milestone Payments**

The Company ultimately admitted that "the FDA concurred with the Company's voluntary hold and placed a clinical hold on ibrexafungerp." ¶44.

6

The Company was also forced to acknowledge that the "clinical hold and recall create uncertainty as to the timing of achieving, and the Company's ability to achieve, the milestones under the license agreement with GSK." ¶44. Unsurprisingly, GSK used these issues to negotiate a better deal with Scynexis. Indeed, on January 1, 2024, the Company disclosed that the agreement with GSX was revised due to the commercialization and clinical development delays such that Scynexis's potential payments were substantially reduced. ¶45. For example, the Company's potential regulatory approval milestone payments were reduced from $70 million to $49 million, commercial milestone payments were reduced from up to $115 million to up to $57.5 million, and sales milestone payments of up to $242.5 million were reduced to as little as $145.5 million. *Id.*

**F.     At All Times, Scynexis Was Required To Ensure Its Manufacturer's Compliance With cGMP And That It Was Preventing Cross-Contamination Of Drug Products**

The FDA promulgates binding regulations on the manufacturing, processing and holding of pharmaceuticals. The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, is promulgated by the FDA to prevent the sale of "adulterated" drugs. ¶¶23-24. Adulterated products include those which are manufactured in insanitary conditions or without compliance with the cGMP regulations. ¶¶24, 31 (citing 21 U.S.C. § 351(a)(2)(A)-(B)). cGMP regulations are codified under 21 CFR Parts 210 and 211 for drug products. ¶¶23-24. Compliance is required, as Scynexis itself acknowledges. ¶¶23, 25, 48. The Company must also ensure that third-party manufacturers comply with cGMP. ¶30; *accord* Def. Br. at 14.[3] Again, as Scynexis acknowledges, this means the Company is "responsible for overseeing and monitoring for

---

[3] Defendants' attempts to undermine the importance of the FDA guidance documents (Def. Br. at 17, n. 4) miss the point. That FDA-2013-D-0558 (Nov. 2016) does not concern beta-lactam exclusively is irrelevant because the Complaint cites it for the purpose of showing "both owners and contract facilities that conduct manufacturing operations" are "responsible for ensuring compliance with CGMP." ¶30.

compliance" with the FDA's requirements including "continual review and *periodic inspections to assess compliance* with cGMP."  ¶48.

### 1. The cGMP Regulations Require Building And Facility Controls To Prevent Cross-Contamination, Particularly For Substances That Can Cause Life-Threatening Allergic Reactions

The FDA imposes stringent requirements on preventing cross-contamination, particularly as it relates to products with the potential for serious, life-threatening allergic reactions, like beta-lactam.  ¶¶26-27.  Specifically, Scynexis must ensure its contract manufacturer has building and facility controls to prevent cross-contamination, including "separate or defined areas or such other control systems for the firm's operations as are necessary to prevent contamination" during manufacturing, processing, packaging, storage, and holding.  *Id.*

### 2. Processing Of Beta-Lactam Drugs Without Complete And Comprehensive Separation From Non Beta-Lactam Products Is Prohibited

Under 21 U.S.C. § 351(a)(2)(A), the manufacture of drugs produced under insanitary conditions is prohibited.  ¶¶31-33.  As explained in FDA-2022-D-2922 (Nov. 11, 2022), under the FDCA, the "[p]rocessing of beta-lactam drugs without complete and comprehensive separation from non- beta-lactam products is an example of an insanitary condition."  ¶33.  This is not merely a recommendation; it is a required, statutory provision under the FDCA.  ¶¶31, 33; *see also* ¶28, n.3-4 (stating that guidance documents are not recommendations when "specific regulatory or statutory requirements are cited").  Likewise, FDA-2016-D-2268 (Nov. 6, 2020) explains that under the FDCA, drugs may not be sold which have been produced under insanitary conditions. ¶¶31-32.  The document gives "examples of insanitary conditions" including the "[p]rocessing of beta-lactams without complete and comprehensive separation from non-beta-lactam products."  *Id.*

### 3. Processing Of Any Beta-Lactam Products In A Manner Which Does Not Prevent Cross Contamination Is Prohibited

Under 21 U.S.C. § 351(a)(2)(B), the manufacture of drugs in a facility not in compliance with cGMP is prohibited. ¶24. As set out in FDA-2011-D-0104, the CGMP regulations, "§ 211.42(c) requires building and facility controls in general to prevent cross- contamination of drug products." ¶26. As FDA-2011-D-0104 makes clear, "[a]ll non-penicillin beta-lactams also have the potential to sensitize individuals and subsequent exposure to penicillin may result in severe allergic reactions in some patients." FDA-2011-D-0104 therefore concludes:

> Because of the potential health risks associated with cross-reactivity (cross-sensitivity) of beta-lactams, *manufacturers should assess and establish stringent controls (including appropriate facility design provisions assuring separation) to prevent cross-contamination.* Just as FDA considers the separation of production facilities for penicillins to be current good manufacturing practice, *FDA expects manufacturers to treat sensitizing non-penicillin beta-lactam-based products similarly.*

¶¶28-29; FDA-2011-D-0104.[4]

### G. Scynexis Falsely Claimed That It Was Ensuring Compliance With Required FDA Regulations Including Preventing Cross-Contamination And Insanitary Conditions Through Continual Review And Periodic Inspections

Scynexis needed to ensure, by "overseeing and monitoring" as well as "continual review and periodic inspections" of its manufacturing facility, that ibrexafungerp was not being

---

[4] Defendants repeatedly claim that the recall was based on "non-binding FDA *draft* guidance that was subject to change." *See, e.g.*, Def. Br. at 22 (emphasis original). FDA-2011-D-0104 is the FDA guidance document the Complaint and Defendants reference. ¶¶28-29; Def. Br. at 17 n. 4. This is not a draft—it was finalized and published in 2013, and it makes clear "any class of sensitizing beta-lactam is manufactured should be separated from areas in which any other products are manufactured." ¶¶28-29. There is a draft version of this guidance which was published in 2022 which further states that "manufacturers handling any non-penicillin beta-lactam antibacterial drugs *or non-antibacterial beta-lactam compounds*" are required to prevent cross contamination through separation. FDA-2011-D-0104 (Revision, June, 2022). This later draft is presumably what Defendants reference. Def. Br. at 22. But a later draft version of the guidance does not undermine the fact that the operative FDA guidance covers non-antibacterial beta-lactam production. ¶¶28-29.

adulterated by production in insanity conditions or non-compliance with cGMP.  ¶¶25-33.

Throughout the Class Period, Scynexis purported to have complied with this responsibility.  ¶48.

Scynexis further claimed during the Class Period that its vendors "have the required capabilities

with respect to facilities, equipment and technical expertise, quality systems that meet global

regulatory and compliance requirements."  ¶¶47, 49.

But at the end of the Class Period, it was revealed that they were not in compliance, when

GSK's review of Scynexis's manufacturing process quickly uncovered that "a non-antibacterial

beta-lactam drug substance is manufactured using equipment common to the manufacturing

process for ibrexafungerp."  ¶41.

## III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

To state a claim for securities fraud under §10(b) of the Exchange Act a plaintiff must

allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives,*

*Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[5]  These claims are subject to the pleading standards

of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), requiring

allegations of fraud to be stated with particularity.  15 U.S.C. § 78u-4(b).  The PSLRA does not

require a plaintiff to plead evidence of claims; on a motion to dismiss, courts must accept all facts

alleged as true.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). As such, a

complaint should not be dismissed if it contains sufficient factual matter that, if accepted as true,

states a claim for relief plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)

---

[5] Defendants do not challenge, and thus concede, elements other than falsity and scienter.  Fed. R. Civ. P. 12(g).

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Stating a claim "does not impose a probability requirement at the pleading stage," but "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."  *Cnty. of Allegheny*, 515 F.3d at 234.

In sum, the issue on Defendants' Motion is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims."  *Langford v. City of Atl. City*, 235 F.3d 845, 847 (3d Cir. 2000).   The Complaint satisfies these pleading requirements, and Defendants' Motion should be denied.

## IV.    ARGUMENT.

### A.    Defendants' Misrepresentations Are Actionable

#### 1.    Legal Standard

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).  The alleged false and misleading statements must be evaluated in the context they would have been understood by a reasonable investor.  *Matrixx*, 563 U.S. at 44.  Literally accurate statements "can become[,] through their context and manner of presentation, devices which mislead investors. " *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) ("For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers.").  Thus, although §10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information, disclosure is required when necessary to make statements made, in the light of the circumstances in which they were made, not misleading."  *Fergus v. Immunomedics, Inc.*, 2020 WL 2832565, at *3 (D.N.J. June 1, 2020).

11

### 2.    Defendants' Statements Were False And Misleading

Plaintiff alleges two types of false statements: (i) statements claiming that the Company's manufacturer was in compliance with appropriate regulatory and compliance requirements and (ii) statements purporting to monitor and ensure such compliance. *See, e.g.*, ¶47 ("The primary third-party vendors with which we have agreements in place to support manufacturing and supply both for clinical development and commercial needs ***have the required capabilities*** with respect to facilities, equipment and technical expertise, quality systems that meet global regulatory and compliance requirements); ¶48 ("we and our contract manufacturers, which ***we will be responsible for overseeing and monitoring for compliance***, are subject to continual review and periodic inspections to assess compliance with cGMP."). These statements were misleading because they omitted the then-existing risk of cross-contamination resulting from Scynexis's failure to ensure cGMP compliance and separation of ibrexafungerp from non-antibacterial beta-lactam substances." ¶51.

That Defendants touted that they had "robust quality assurance systems" was misleading for omitting that the Company's sole manufacturing facility was already at risk of cross-contamination. ¶¶35, 41, 47-51, 59; *see Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 187 (D.N.J. 2022) (sustaining false and misleading statements related to failure to disclose speculative risk of FDA regulatory breach); *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (finding descriptions of processes that a company takes to comply with regulatory requirements, even if "technically true," are misleading where they omit information that inaccurately "gave comfort to investors that reasonably effective steps were being taken to comply with applicable ... regulations").

Contrary to Defendants' suggestion, the Complaint adequately pleads that the risk of cGMP non-compliance had already materialized during the Class Period. *Cf.* Def. Br. at 9-10. The

12

contamination risk was so pervasive that all of the Company's outstanding product, both in market and in clinical development since August 2021, was affected. ¶41. A plausible inference is that the risk existed at all times of production because Defendants apparently could not narrow when the facility first failed to segregate substances and which production batches could be affected. *See, e.g.*, *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 690 (3d Cir. 2023) (rejecting fraud-by-hindsight as to "momentous" increase in life insurance reserves that was "close in time" to statement regarding underlying mortality assumptions).

Indeed, the risk of cross-contamination was only alleviated when Scynexis engaged a new manufacturer to produce and sell ibrexafungerp, demonstrating that Defendants could not assure the safety of any of the recalled product. *See* ¶46. Defendants purport to have initiated the recall "out of an abundance of caution," but that provides no solace when GSK and the FDA itself confirmed a recall was necessary. ¶¶41, 43. Similarly, that there were no adverse events (Def. Br. at 11) yet is not relevant; the risk of cross-contamination alone is sufficient to render Defendants' statements actionable, and the absence of adverse events did not relieve Scynexis from its disclosure obligations. *Becton*, 620 F. Supp. 3d at 167 (absence of a formal FDA warning letter did not permit the company to issue misleading statements that failed to recognize risks posed by enforcement action); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 218 (E.D. Pa. 2021) ("commitment" to "safety" actionable "based on the facts on the ground" especially where "statements regarding safety [are] material in industries carrying high safety risks, and where the safety of the business is therefore related to the success of the business").

Defendants' wrongly claim that actual knowledge of the undisclosed risk is required to plead falsity. *See* Def. Br. at 8, 11. As Defendants acknowledge elsewhere, Defendants' access to the undisclosed information suffices. Def. Br. at 9 (citing cases for principle that Plaintiff must

13

demonstrate that "each Defendant had access to such information").   Plaintiff pleads such facts: that GSK quickly discovered the non-compliance demonstrates that the lack of segregation between substances was information readily accessible to Defendants, especially as Defendants who held themselves out to oversee and monitor its vendors.  ¶¶35, 47-49. Whether Defendants had received "reports of actual cross-contamination, related side effects, or adverse events" is irrelevant, as is whether "the FDA [had] request[ed] the recall or determine[d] that the Company had violated any FDA rule or regulation."  Def. Br. at 1; *see, e.g.*, *Todd v. STAAR Surgical Co.* 2016 WL 6699284, at *12 (C.D. Cal. Apr. 12, 2016) ("neither a Form 483 nor a Warning Letter is necessary to impute knowledge of [cGMP] violations" at a manufacturing facility).[6]

Unlike in Defendants' cited cases, the undisclosed risk was discoverable at the time the statements were made. *See* Def. Br. at 10-12 (citing cases).[7] Defendants had the ability to uncover it if the Company had actually monitored its manufacturing facility (as Defendants purported to do).  ¶48 (acknowledging that Scynexis is "responsible for overseeing and monitoring for compliance" by its contract manufacturer).  As a research analyst pointed out, a physical inspection of the facility ahead of Scynexis's licensing agreement with GSK was "expected."  ¶63.  Had Defendants inspected the facility, they would have uncovered the cross-contamination risk, as is

---

[6] Again, Plaintiff is not required to plead facts that can only be attained through discovery. *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001); *In re Majesco*, 2006 WL 2846281 at *6.

[7] *In re Discovery Lab'ys Sec. Litig.*, 2006 WL 3227767, at *12 (E.D. Pa. Nov. 1, 2006) (difficulties with application were not known until *two years after* alleged misstatement regarding regulatory approval); *Hoey v. Insmed Inc.*, 2018 WL 902266, at *17 (D.N.J. Feb. 15, 2018) (regulator's report of deficiencies did not undermine company's position regarding clinical results); *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621, 623 (9th Cir. 2022) (later-disclosed "software bugs" were not the same as the materialized, disclosed improper data-sharing with advertisers); *Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *14, (D.N.J. Aug. 4, 2022) (no allegations regarding defendants' access and cited materials stated that FDA informed company of deficiencies days before public report).

14

clear from the fact that GSK was able to quickly uncover it. ¶62.[8]

### 3.    Defendants' Misstatements Were Material

A misstatement or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992). Thus, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* Materiality is thus not suitable for disposition on a motion to dismiss. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275-76 (3d Cir. 2004).

Here, Defendants created a materially misleading view of the Company, which can be seen by both analysts' reactions to the news of the disclosure and the impact of the disclosure on the price of the Company's stock. Indeed, a Ladenburg Thalmann analyst expressed shock that the cross-contamination risk was not uncovered earlier. ¶¶10, 63 ("We still lack clarity as to why the manufacturing equipment was shared with beta-lactams and how it was not discovered earlier."); *see In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (statements by

---

[8] By contrast, Defendants cite cases where it was not reasonable to infer knowledge from later developments. *Connor v. Unisys Corp.*, 2024 WL 387633, at *8 (E.D. Pa. Feb. 1, 2024) (new internal control over financial reporting did not suggest company previously failed to comply with industry standards); *Johnson v. Costco Wholesale Corp.*, 2020 WL 4816225, at *7 n.15 (W.D. Wash. Aug. 19, 2020) (scienter not supported where allegations demonstrated compliance with requirements to oversee internal controls over financial reporting).

analysts supported conclusion that defendants' statements conveyed a misleading impression); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (similar). The stock market's sharp reaction (more than 34% decline) to the disclosure of recall that resulted from uncovering the undisclosed risk further confirms the materiality of the omission. ¶¶9, 54; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market reaction" to disclosure of security vulnerabilities "support[ed] the materiality of the misleading omission"); *accord In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *15 (D.N.J. Mar. 24, 2008) ("Alleging, as the Complaint does here, the significant decrease in stock price immediately following the disclosure of the adverse information satisfies the Third Circuit's standard for pleading materiality").

This creates a pleading-stage inference of materiality, demonstrating that Defendants had not adequately warned of the risk. *Cf* Def. Br. at 13-14. Certainly, if the "exact risk" was sufficiently disclosed, these things would not have occurred. *See Loc. 731 I.B. of T. Excavators & Pavers Pens. Tr. Fund v. Swanson*, 2011 WL 2444675, at *13 (D. Del. June 14, 2011) (cautions not sufficiently specific when none warned of "secular decline" referenced in claims). "[G]eneric warning[s]," such as those here "will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Jinkosolar*, 761 F.3d at 251. Indeed, Defendants' cited language—such as that "Outsourcing these functions involves risk that third parties may not perform to our standards, may not produce results in a timely manner or may fail to perform at all" or that there could be "problems with the facility where the product is manufactured" that could "require a recall" (Def. Br. at 14)—could apply to any drug manufacturer. *See In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *18 (E.D. Pa. Mar. 25, 2020) ("generic warning" that is "inherently true" not meaningful). These "warnings" said nothing about the specific undisclosed facts on the ground known to Defendants,

16

such as that they had failed to undertake or ensure necessary compliance efforts. *See Becton*, 620 F. Supp. 3d. at 191.[9]

Defendants' purported warning that it had few employees is also unavailing because Scynexis held out its experience in drug manufacturing, thereby counteracting any implication that its size was a detriment to ensuring proper drug production. *E.g.*, ¶59 ("SCYNEXIS at its DNA actually is a manufacturing company. . . . So we know how to develop, produce, manufacture a product."). Moreover, Defendants falsely assured that Scynexis has "a team that is capable of managing these activities until GSK assumes responsibility for them." ¶47.

### 4.    Defendants' Statements Are Not Opinions Or Puffery

Defendants further argue that their false statements are inactionable opinion statements of corporate optimism. Def. Br. at 18-19. To begin with, Defendants' argument is a misreading of the Complaint's falsity allegation. *See* Def. Br. at 18 (selectively quoting falsity theory). The Complaint pleads specific reasons for falsity that were verifiable at the time the statements were made: Defendants could have confirmed whether the equipment was separated or if the manufacturer was complying with cGMP, but without doing so they lacked a reasonable basis for their statements, which were central to the Company's purpose as a drug developer. So at the time these statements were made, Defendants did not present them as opinions, but as direct and concrete assertions of fact. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) ("determinate, verifiable statement[s]" are "not mere puffery"); *SEB Inv.*

---

[9] Because Defendants' cautionary language did not meaningfully inform investors of the impending risks inherent in its strategies and failed remediation, it is distinguishable from Defendants' authorities. *In re Amarin Corp. PLC Sec. Litig*., 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) (finding that defendants "warned of the exact risk" that plaintiff's claimed was not disclosed); *Paxton*, 2022 WL 3098236, at *14 (finding defendants promptly disclosed the specific risk at issue); *Bauer v. Eagle Pharm., Inc*., 2017 WL 2213147, at *11 (D.N.J. May 19, 2017) (finding that cautionary language was sufficiently tailored to and disclosed the actual "risks that came to fruition").

*Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 896-97 (E.D. Pa. 2018) (pharmaceutical company's statements regarding drug safety were not puffery as defendants had access to countervailing information, which would have shown beliefs were not reasonably held).[10]   And whether the Company used certain superlatives along with their misstatements does not alter that the statements are actionable.  *See, e.g.*, *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617 (S.D. W. Va. 2012) (safety was "first priority every day" was not puffery because its veracity can be determined and "Defendants closely aligned their statements of commitment to safety to their productivity and success as a company").

In any event, "a statement is considered puffery only when it is immaterial." *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015). The alleged statements and omissions are material.  *See* Sec. IV.A.3, *supra*.  At most, this is a fact question that is not appropriate for determination on the pleadings.  *See In re Adams*, 381 F.3d at 275-76.

> **5.      Defendants Had A Duty To Disclose That The Company's Manufacturers Were Not In Compliance With Appropriate Requirements And The Company Was Failing To Monitor And Ensure Such Compliance**

While "[a]bsent a duty to disclose, silence is not fraudulent or misleading under Rule 10b-5," courts have long recognized that "[w]hen you speak . . . you are bound to speak truthfully." *U.S. v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010).  Here, the false statements certainly put the issues into play, requiring the Company to speak truthfully.  Specifically, the statements concern the Company's ability to oversee quality assurance of drug manufacturing and cGMP compliance.

---

[10] Defendants' cited cases involved where the statements were not capable of verification. *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *19 (M.D. Pa. June 22, 2015) (finding that representations of "sound" credit practices and "stringent" underwriting standards were too vague to be verified); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) (company's "strong and experienced management team" was puffery where "none of the omissions call into question this aspect of the management team's experience").

18

¶¶47, 48.  These statements put the Company's assurance of its manufacturer's compliance with cGMP, including the undisclosed risk thereto, at play.  *Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*16 (D.N.J. Dec. 27, 2019) ("[b]y placing the nature of the Company's" conduct "in play," defendants acquired duty to disclose adverse facts); *McDermid v. Inovio Pharm., Inc.*, 520 F. Supp. 3d 652, 667 (E.D. Pa. 2021) (statements about "manufacturing deals and progress" put "manufacturing capabilities" at play).[11]  Additionally, Defendants' disclosure obligations also arose from their self-proclaimed intimate knowledge of the manufacturing of its lone drug. ¶59.

Defendants cherry-pick the false statements to claim that there is a "mismatch" between their statements and the undisclosed risk of cross-contamination or non-compliance with cGMP. Def. Br. at 15-17 ("None of these statements say that the third-party vendors are meeting every regulatory requirement").  These arguments are red herrings.  Plaintiff does not seek to require that Defendants guarantee Scynexis's facilities complied with "every regulatory requirement."  The omitted information relates to the most basic cGMP compliance concerns: that the Company's sole product is not cross-contaminated by other substances produced at the same facility.  The significance of this information cannot be understated; cross-contamination of beta-lactam can lead to "serious and life-threatening potential to cause allergic responses," thus they must be "complete[ly] and comprehensive[ly]" separated from non-beta-lactam products.[12]  ¶¶6, 58. Defendants had an obligation to disclose knowable material risks to their business that were related

---

[11] In contrast, in *In re Mylan N.V. Sec. Litig.*, the "statement is clearly and objectively about the physical condition of the manufacturing facilities and the machinery and equipment contained within them," not Mylan's compliance with specifically relevant regulations.  2023 WL 3539371, at \*13 (W.D. Pa. May 18, 2023).

[12] Defendants' attempts to minimize the import of the cGMP guidelines by referring to them as non-binding and "draft" should not be countenanced. Indeed, it is shocking that even after the recall and GSK using it to renegotiate the deal with the Company, taking tens of millions of dollars potentially away from the Company and its shareholders, that Defendants continue to cast these guidelines as non-binding and unimportant.

19

to their public statements. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) ("Half-truths," which "state the truth only so far as it goes, while omitting critical qualifying information" are actionable under Section 10(b)); *SEB Inv. Mgmt.*, 351 F. Supp. 3d at 900 (finding statements which selectively disclosed positive data misleading as defendant may not describe "a favorable picture" of material issue "without including the details that would have presented a complete and less favorable one"); *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *17 (D.N.J. Dec. 19, 2019) (finding statements regarding drug NDA submission actionable half-truths where the company knew or should have known the FDA's NDA approval requirements were not met, as the applicable FDA guidance put the company on notice concerning the issue).

### B.      The Complaint Raises A Strong Inference Of Scienter

Scienter is sufficiently alleged when allegations give rise to a strong inference of "either reckless or conscious behavior." *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009). Recklessness encompasses "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267, n.42. Conscious behavior, meanwhile, exists when a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing [non-culpable] inference." *Tellabs*, 551 U.S. at 324, 328 (emphasis in original). An inference of scienter need not be *more* likely than any non-culpable inference; in the face of equally compelling inferences, a tie goes to the plaintiff. *Id.* at 324 ("[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"). Moreover, scienter can be inferred from

20

"circumstantial evidence." *Avaya*, 564 F.3d at 276. On Defendants' Motion, the key inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310. As shown below, Plaintiff's allegations, taken together and read holistically, are adequate to allege a strong inference of scienter.

As discussed above, the relevant guidelines regarding developing the Company's drug, including that processing beta-lactam drugs without complete and comprehensive separation from non beta-lactam products is prohibited, are clear on the obligations for Scynexis and its executives who controlled the drug making process. *See* Sec. II.F, *supra*. As a small company that claimed to be experienced in drug development, Defendants were undoubtedly aware of these requirements or else they would have been reckless in running their business that consisted of selling a single drug. As such, Defendants' failure to confirm or investigate whether the manufacturing equipment was not shared with beta-lactams was severely reckless. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of…recklessness.").

The inference of scienter is further strengthened because Defendants' conduct concerned "core matters of central importance to the company and its high-level executives." *Energy Transfer*, 532 F. Supp. 3d at 232; *see also Becton*, 620 F. Supp. 3d at 196. "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015); *Campbell Soup*, 145 F. Supp.

21

2d at 599 ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business") (collecting cases).

Here, the Company's primary purpose was the commercialization of ibrexafungerp, its lone drug. As such, Scynexsis' executives were finely attuned to the details of the only manufacturer of its only drug, [13] or they were severely reckless if they were not. *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (scienter well-pleaded where misrepresentations concerned three drugs constituting "substantial portion" of revenues and operations); *Avaya*, 564 F.3d at 268 (recognizing a "core operations inference" supports scienter when securities fraud alleged related to core matters of central importance to a company); *In re Vicuron Pharms., Inc. Sec. Litig.*, 2005 WL 2989674, at *10 (E.D. Pa. Jul. 1, 2005) (where drug was company's "lead product in development, its importance to the company supports at least a strong inference of recklessness of all the company's officers"); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *3 (S.D.N.Y. Feb. 1, 2005) (finding "make or break" product for the company supported scienter of individual defendants). Indeed, "it is absurd to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014).

Moreover, that Defendants publicly discussed the manufacturer of its drug further supports

---

[13] "[T]he magnitude of the fraud, while not determinative of scienter, is probative of it." *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506 (W.D. Pa. 2002); *see also Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21 (D.N.J. July 27, 2018) (size of the scheme supports inference of scienter). Here, the omission of material facts went to the fundamental business of the Company.

scienter. *In re Enzymotec*, 2015 WL 8784065, at *18 (scienter inferred where "matter at issue [wa]s central to the core business of the Company,[ ] about which Defendants spoke regularly").[14] And by signing SEC documents that included material misstatements and omissions, the Individual Defendants had a "duty to familiarize themselves with the facts relevant to the core operations of [the company]." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 459, 496 (S.D.N.Y. 2005).

When read holistically, Plaintiff's allegations support a strong inference of scienter. Defendants make a series of specious arguments. First, Defendants claim that the Complaint must plead confidential witnesses or other documentary evidence to demonstrate scienter. *See, e.g.*, Def. Br at 2. But Plaintiff is not required to plead facts that can only be attained through discovery. *Liberty Ridge*, 173 F. Supp. 2d at 137 (fraud pleadings do not require specificity that can be achieved only through discovery); *In re Majesco*, 2006 WL 2846281 at *6.

Second, Defendants claim that the Court should not consider the fact that GSK was quickly able to uncover the issues by inspecting the facility. Def. Br. 22. According to Defendants, considering this well-pled fact would somehow constitute "quintessential fraud by hindsight pleading that runs contrary to the PSLRA." *Id.*[15] Not only can the Court consider this fact, it must under the holistic inquiry. Defendants, of course, want to avoid this fact because it demonstrates that it was relatively easy for the risk to be uncovered and that they recklessly failed to ensure that the manufacturing facility was not complying with appropriate guidelines. *See* ¶¶62-64. This fact

---

[14] *See also Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (scienter adequately pled where defendants represented "they closely monitored" the subject of their false statements because they either "failed to perform the monitoring they claimed to have performed or they uncovered [the truth and] knowingly or recklessly misrepresented the circumstances to plaintiffs"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the subject of the fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

[15] Defendants fail to cite any authority for this position.

further supports the finding of scienter. *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *14 (S.D.N.Y. Aug. 8, 2012) ("[Q]uick discovery of an alleged error in the defendant-company's financial statements" "support[s] an inference of recklessness.").[16]

Third, Defendants claim that the absence of financial motive allegations cuts against the scienter. Def. Br. at 21. But this argument fails because the Third Circuit has consistently held that "a plaintiff need not necessarily demonstrate motive and opportunity to adequately support a finding of scienter." *Papa*, 2018 WL 3601229, at *18 (strong inference of scienter for director defendants who did not make stock sales); *see also Tellabs,* 551 U.S. at 325 ("absence of a motive allegation is not fatal"); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 548 (D.N.J. 2010) ("Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are [ ] necessary . . . .").

Regardless, Defendants did have a motive not to disclose the risks of their failure to ensure compliance. As the Complaint alleges, the Company was hemorrhaging money and needed a commercialization partner to fund its pivot away from its financial failure of treating yeast infections. ¶¶36-40; *In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 31 (D. Mass. 2004) (scienter supported by allegations that company was "burning cash at a high rate and was dependent on [product] as the most promising drug in its pipeline"); *accord In re Cabletron Sys.*, 311 F.3d 11, 39 (1st Cir. 2002) (concealment of worsening financial condition was "more than the

---

[16] *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO . . . discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly."); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 483 (E.D. Va. 2002) ("the brief lapse of time between the unqualified audit opinion and the reporting by HM of total financial devastation provides further support for Deloitte's knowledge that its unqualified audit opinion was false when issued").

usual concern by executives to improve financial results"). Disclosing the risks to its business could have thwarted the GSK agreement or—as ultimately occurred—made the deal less advantageous to the Defendants, so they decided to bury the risks and hoped they would not come to fruition. ¶45 (GSK renegotiating the terms to the Defendants' extreme detriment). Moreover, while the Individual Defendants may not have sold their shares, they were large holders of the Company's stock and stood to gain from the valuable partnership with GSK.[17]

Viewing these allegations holistically, as the Court must do under *Tellabs*, the most cogent inference is that Defendants had knowledge of, or were reckless in not knowing, that the manufacturing facility was not complying with appropriate guidelines. Either way, the Complaint adequately pleads that Defendants acted with scienter. *See In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (plaintiffs "sufficiently alleged that the Defendants *either* knew that their statements were false *or* acted with reckless disregard for the truth of those statements").

### C. Plaintiff Adequately Alleges Control Person Liability

"Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a corporation that has committed a violation of Section 10(b)." *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *19 (E.D. Pa. June 16, 2015) (citing 15 U.S.C. § 78t(a)). Thus, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b)." *Urban Outfitters*, 103 F. Supp. 3d at 657 n.6. Defendants contest control person liability under Section 20(a) only on the ground that there

---

[17] For example, just prior to the Class Period, Defendant Angulo received 110,000 Scynexis shares at zero cost, resulting in 185,181 total shares held. *See* January 3, 2023 Form 4, available at https://www.sec.gov/Archives/edgar/data/1178253/000120919123000155/xslF345X03/doc4.xml ; *see* Def. Br. at 3 n.3 (citing cases for proposition that the Company's SEC filings may be considered).

is no primary violation.  Def. Br. at 23.  Because, as shown in the preceding sections herein, Plaintiff adequately pleads a claim under Section 10(b), a Section 20(a) claim is also adequately pleaded.  *Urban Outfitters*, 103 F. Supp. 3d at 657.

## V.     **CONCLUSION**

For all the reasons stated herein, Plaintiff requests that the Court deny Defendants' motion to dismiss in its entirety.  If the Court is inclined to grant, in whole or in part, Defendants' motion, Plaintiff respectfully requests that dismissal be without prejudice and with leave to amend to cure any defects via an amended pleading.  *See* Fed. R. Civ. P. 15(a)(2); *Junker v. Med. Components, Inc.*, 2015 WL 12806501, at *3 n.1 (E.D. Pa. May 20, 2015) ("The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that 'a particular claim will be decided on the merits rather than on technicalities.'"). This is particularly the case here where Plaintiff has not been given the opportunity for a judicial decision about the sufficiency of his allegations. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 190-91 (2d Cir. 2015) (emphasizing the "liberal spirit" of Rule 15 and warning against dismissal with prejudice prior to plaintiffs being given "the benefit of a ruling" that details the "precise defects" in their pleading).

Dated: February 18, 2025

By: */s/ Donald A. Ecklund*
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
Donald A. Ecklund
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiff*

26

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Plaintiff*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Plaintiff*

27

## PROOF OF SERVICE

I hereby certify that on this 18th day of February, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Donald A. Ecklund
Donald A. Ecklund
